The Honorable Thomas S. Zilly

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

NEXTUNE, INC., a Washington Corporation,

Plaintiff,

v.

ROBERT BUCKNER McKINNEY,
individually; CHRISTOPHER SCOTT
HARRISON, individually; and EMI MUSIC
NORTH AMERICA, a Delaware Corporation,

Defendants.

Case No. 2:12-cv-01974

DECLARATION OF JASON R.
DONOVAN IN SUPPORT OF
PLAINTIFF'S SUPPLEMENTAL
OPPOSITION TO DEFENDANT
CHRISTOPHER SCOTT HARRISON'S
MOTION TO DISMISS PURSUANT TO
FRCP 12(b)(2)

I, Jason R. Donovan, declare as follows:

1.      I am counsel for plaintiff nexTUNE, Inc. in the above-captioned matter and the claims asserted in this action.  I am over 18 years of age, have personal knowledge as to the matters set forth herein, and am competent to testify to them.

2.      Attached as **Exhibit A** are true and correct copies of excerpts from the transcript of the March 4, 2013 deposition of Defendant Christopher Scott Harrison.

3.      Attached as **Exhibit B** is a true and correct copy of the Washington State Secretary of State Corporations Division listing for DMX, Inc.

4.      Attached as **Exhibit C** is a true and correct copy of the Washington State Secretary of State Corporations Division listing for Capitol Records, LLC, a division of Defendant EMI Music North America.

DECLARATION OF JASON R. DONOVAN - 1
Case No. 2:12-CV-01974

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

51283573.1

1       5.     Attached as **Exhibit D** are true and correct copies of the Washington State

2   Secretary of State Corporations Division listings for Pandora Media, Inc. and Pandora Media

3   California, LLC.

4       6.     Attached as **Exhibit E** is a true and correct copy of a March 8, 2013 e-mail from

5   nexTUNE's CEO/President Michael DuKane.

6       I declare under penalty of perjury that the foregoing is true and correct.  Executed at

7   Seattle, Washington this 15th day of March, 2013.

8

9

10                         Jason R. Donovan, WSBA No. 40994

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DECLARATION OF JASON R. DONOVAN - 2
Case No. 2:12-CV-01974

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400   FAX (206) 447-9700

51283573.1

1

## CERTIFICATE OF SERVICE

2          I certify that on March 15, 2013, a true copy of the foregoing document was served

3 electronically upon the parties via CM/ECF, or as indicated, as follows:

4   Don Paul Badgley                          ☐ via Hand Delivery
    Badgley Mullins Law Group                 ☐ via First Class Mail, postage prepaid
5   701 Fifth Avenue, Suite 4750              ☐ via Facsimile
    Seattle, Washington  98104                ☐ via E-mail
6   Phone: 206-621-6566                       ☒ via Electronic Court Filing
    Fax: 206-621-9686
7   Email: donbadgley@badgleymullins.com
    *Counsel for Defendant Christopher Scott*
8   *Harrison*

9   R. Buck McKinney                          ☐ via Hand Delivery
    Law Office of Buck McKinney, PC           ☒ via First Class Mail, postage prepaid
10  2203 East 5th Street                      ☐ via Facsimile
    Austin, Texas  78702                      ☐ via E-mail
11  Phone: 512-236-0150                       ☐ via Electronic Court Filing
    Fax: 512-444-1879
12  Email: bmckinney7@grandecom.net

13  Hall Baetz                                ☐ via Hand Delivery
    Baetz Lamka Clark LLP                     ☐ via First Class Mail, postage prepaid
14  601 Union Street, Suite 1500              ☐ via Facsimile
    Seattle, Washington  98101                ☐ via E-mail
15  Phone: 206-973-1610                       ☒ via Electronic Court Filing
    Email: hallbaetz@baetzlamkaclark.com
16  hallbaetz@comcast.net
    *Counsel for EMI Music North America*
17

18  R. Buck McKinney                          ☐ via Hand Delivery
    Law Office of Buck McKinney, PC           ☐ via First Class Mail, postage prepaid
    2203 East 5th Street                      ☐ via Facsimile
19  Austin, Texas  78702                      ☐ via E-mail
    Phone: 512-236-0150                       ☒ via Electronic Court Filing
20  Fax: 512-444-1879
    Email: bmckinney7@grandecom.net
21  *Pro Hac Vice Counsel for EMI Music*
    *North America*

22

23

24                              *s/Jason R. Donovan*
                                Jason R. Donovan
25

26

CERTIFICATE OF SERVICE - 3

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

51283573.1

# EXHIBIT A

Page 1

IN THE UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON


NEXTUNE, INC., a Washington
corporation,

      Plaintiff,

      vs.                NO. 2:12-cv-01974-TSZ

ROBERT BUCKNER McKINNEY,
individually; CHRISTOPHER
SCOTT HARRISON, individually;
and EMI MUSIC NORTH AMERICA,
a Delaware corporation,

      Defendants.
~~~~~~~~~~~~~~~~~~~~~~~~~~~~



DEPOSITION OF

CHRISTOPHER SCOTT HARRISON



March 4, 2013

11:30 a.m.



1300 Clay Street, Suite 600
Oakland, California



Diane M. Winter, RMR, CRR, CSR 3186

Page 12

1          A.    No.

2          Q.    And so after -- when you left Fulbright

3     in 2005, where did you go?

4          A.    DMX, Inc.

5          Q.    And where is DMX, Inc. located?

6          A.    Austin, Texas.

7          Q.    In what capacity were you employed at

8     DMX, Inc.?

9          A.    Vice president business affairs.

10          Q.    What were your responsibilities as vice

11     president of business affairs?

12          A.    Primarily responsible for negotiating

13     contracts.

14          Q.    Anything else?

15          A.    No.

16          Q.    And what kind of contracts would you

17     negotiate?

18          A.    Contracts in which DMX was a supplier,

19     contracts in which DMX was obtaining service from a

20     vendor, lease agreements.

21          Q.    Let me take a step back.  Can you please

22     describe for me what DMX's business is.

23          A.    DMX is a commercial music service

24     provider.

25          Q.    And what do you mean by "commercial

Page 14

1    it -- strike that.

2              Where are DMX's clients located?

3         A.   Are you asking when I was vice president

4    of business affairs?

5         Q.   Yes.

6         A.   They would have been primarily in the

7    continental US.

8         Q.   So Texas, where it's located?

9         A.   Correct.

10        Q.   California?

11        A.   Yes.

12        Q.   Washington?

13        A.   I'm sure.

14        Q.   And during that period of time when you

15   were vice president of business affairs for DMX, did

16   you negotiate contracts with commercial entities in

17   the state of Washington?

18        A.   Not that I recall.

19        Q.   Do you recall where you negotiated the

20   contracts?

21        A.   I don't understand your question.

22        Q.   For the contracts that you negotiated as

23   vice president of business affairs for DMX, did you

24   have a contract with each commercial customer?

25        A.   Yes.

Page 33

1      Q.   And you were in private practice from

2   June 2012 until what point?

3      A.   November 2012.

4      Q.   And during that period of time did you

5   hold any other positions with any other companies or

6   any other sources of employment?

7      A.   No.

8      Q.   Okay.  I'll get back to that.

9           And then in November 2012 did you stop --

10  you stopped practicing law --

11     A.   Correct.

12     Q.   -- for private practice?

13     A.   Correct.

14     Q.   And what was the next position?

15     A.   Assistant general counsel Pandora Media,

16  Inc.

17     Q.   And Pandora is located here in

18  California?

19     A.   Correct.

20          (Off the record.)

21     Q.   Can you please describe for me Pandora's

22  business.

23     A.   They are an internet radio -- excuse me,

24  personalized internet radio service.

25     Q.   And does Pandora only operate here in

Page 36

1    not commercial establishments.

2         Q.   So DMX and Mood Media deal with

3    commercial establishments?

4         A.   Correct.

5         Q.   Got it.  You earlier testified that you

6    served in an undefined title at DMX between March

7    2012 and June 2012, followed by a period of five

8    months when you were in private practice.  You also

9    testified that you did not have any other sources of

10   employment during that period of time.

11             Were you ever employed by Mood Media?

12        A.   I was not.

13        Q.   Mr. Harrison, if you could turn back to

14   Exhibit 5, declaration of Michael DuKane, again.

15        A.   Uh-huh.

16        Q.   And turn to page 6 of 20.  Could you

17   identify what this document is?

18             MR. BADGLEY:  Can you hold -- oh, okay.

19   Go ahead.

20             THE WITNESS:  Appears to be a printout

21   of my LinkedIn Profile.

22        Q.   (BY MR. DONOVAN)  And near the bottom of

23   that page it indicates -- well, did you create this

24   page?

25        A.   Yes.

Page 39

1          Q.   Is there any ownership relation between

2     Mood and Pandora?

3          A.   No.

4          Q.   Do you know who Robert Buckner McKinney

5     is?

6          A.   Yes.

7          Q.   And I'll just, for ease of reference,

8     I'll refer to him as Buck.  How long have you known

9     Buck?

10         A.   Five or six years.

11         Q.   And how did you meet Buck?

12         A.   Buck and I served on the Texas

13    entertainment-sports-law section of the Texas State

14    Bar.

15         Q.   And Buck is an attorney, yes?

16         A.   He is.

17         Q.   When did you first start working with

18    Buck?

19         A.   Summer of 2012.

20         Q.   So right after you left DMX?

21         A.   Yes.

22         Q.   In June 2012?

23         A.   Yes.

24         Q.   And did Buck approach you about working

25    together, or did you approach Buck?

Page 40

1        A.   I don't recall.

2        Q.   Was there any formal agreement between

3   the two of you in terms of compensation or how

4   matters would be handled?

5        A.   There was nothing reduced to writing.

6        Q.   Were there any oral agreements?

7        A.   Yes.

8        Q.   And what were those?

9        A.   Buck and I would share fees.

10        Q.   What kind of fees?

11        A.   To the extent we were successful in

12   prosecuting claims on behalf of clients, we would

13   split those recoveries.

14        Q.   And what kind of claims?

15        A.   Copyright infringement.

16        Q.   Were you ultimately successful in

17   prosecuting any of those copyright infringement

18   claims?

19        A.   Not yet.

20        Q.   And are there any other claims that you

21   and -- that you and Buck were pursuing aside from

22   nexTUNE?

23        A.   Yes.

24        Q.   And who were those other entities?

25        A.   I believe the targets of my clients'

Page 41

```
 1      enforcement actions are privileged.
 2                  MR. BADGLEY:  Yeah, I don't see that
 3      that goes to the jurisdictional issue in this case,
 4      Counsel.
 5              Q.  (BY MR. DONOVAN)  So are you refusing to
 6      answer?
 7              A.  I'm saying that the targets of my
 8      clients' enforcement actions are privileged.
 9              Q.  So you are refusing to answer?
10              A.  I have given you my answer.
11              Q.  Okay.  And is EMI one of your clients?
12              A.  EMI is one of my clients --
13              Q.  Do you have any --
14              A.  Hold on.
15              Q.  I'm sorry.
16              A.  EMI was one of my clients.
17              Q.  Okay.  And do you have any other
18      clients?
19              A.  I do.  I'm sorry, let me rephrase.  I
20      did.
21              Q.  Okay.  When did you first learn -- did
22      you first learn about the nexTUNE alleged copyright
23      infringement right when you started with Buck in
24      June 2012?
25              A.  I don't recall.
```

Page 42

1      Q.   Do you recall when you first got

2   involved with the alleged copyright infringement

3   claim involving nexTUNE?

4      A.   I don't recall.

5      Q.   In September 7, 2012, did you

6   participate in a meeting with nexTUNE?

7      A.   I don't know if that's the exact date,

8   but around that timeframe, yes.

9      Q.   In early September 2012 you were

10  involved in a meeting with Mr. DuKane --

11     A.   Yes.

12     Q.   -- Buck and yourself, correct?

13     A.   That's correct.

14     Q.   Okay.  And what had you done to prepare

15  for that meeting?

16     A.   I don't recall.

17     Q.   You had materials with you at that

18  meeting?

19     A.   I don't recall.

20     Q.   Do you recall receiving information

21  involving nexTUNE that was provided by Mr. DuKane?

22     A.   Yes.

23     Q.   And when did you receive that

24  information?

25     A.   Excuse me?

Page 43

1          Q.   Do you recall when you received that

2     information?

3          A.   I don't recall exactly.  It would have

4     been close in time to the meeting.

5          Q.   And who provided you that information?

6          A.   I don't recall whether I got it from the

7     client or from Mr. McKinney.

8          Q.   What did you do with that information?

9          A.   I reviewed it.

10         Q.   Do you still have that information?

11         A.   I believe that I do.

12         Q.   And this information was provided in

13    connection with Mr. McKinney's and yours attempt to

14    successfully prosecute the copyright infringement

15    claim against nexTUNE, correct?

16         A.   No.

17              MR. DONOVAN:  Can you repeat that last

18    question?

19              (Record read as follows:  "And this

20    information was provided in connection with

21    Mr. McKinney's and yours attempt to successfully

22    prosecute the copyright infringement claim against

23    nexTUNE, correct?")

24         Q.   (BY MR. DONOVAN)  That information was

25    provided in connection with what?

Page 44

1        A.    I believe Mr. DuKane provided that

2    information in the hopes of settling claims that the

3    nexTUNE service did not have the appropriate

4    licenses from EMI to operate its business.

5        Q.    Isn't that a copyright infringement

6    claim?

7        A.    Yes, it is.

8        Q.    So it was received in connection with a

9    copyright infringement claim involving nexTUNE?

10       A.    Yes.

11       Q.    Do you recall -- you stated that the

12   information was provided by Mr. DuKane.  Do you know

13   why he provided that information?

14       A.    I believe EMI had requested certain

15   information about the nexTUNE service to

16   substantiate claims Mr. DuKane had made regarding

17   the -- whether or not it was licensed.

18       Q.    When you say "EMI," do you mean Buck?

19       A.    I mean EMI.

20       Q.    Who at EMI?

21       A.    The attorney that we -- well, the

22   attorney at EMI, Melissa Battino.

23       Q.    Melissa Battino?

24       A.    Correct.

25       Q.    So Buck never requested that

Page 45

1    information?

2          A.   Buck may have requested it on behalf of

3    his client, EMI.

4          Q.   Who is also your client?

5          A.   That's correct.

6          Q.   So Buck may have requested the

7    information from nexTUNE, correct?

8          A.   Buck may have requested the information

9    on behalf of his client, EMI, from nexTUNE, that's

10   correct.

11         Q.   So it wasn't by accident that you

12   received the information of nexTUNE's?

13         A.   I don't know what you mean.

14         Q.   The information that nexTUNE provided

15   was pursuant to a specific request for that

16   information, correct?

17         A.   Yes, that's correct.

18         Q.   So it wasn't information that you just

19   happened to stumble on?

20         A.   I don't know what you mean.

21         Q.   It wasn't information that you just

22   discovered independently, correct?

23         A.   The information that I received was

24   provided by Mr. DuKane in response to a request from

25   EMI.

Page 46

1          Q.    Uh-huh.  Or from Buck?

2          A.    He requested it on behalf of his client,

3     EMI.

4          Q.    How long have you known Mr. DuKane?  I'm

5     sorry, let me step back.  Do you know Michael

6     DuKane?  Do you know who Michael DuKane is?

7          A.    Yes.

8          Q.    And how long have you known who Michael

9     DuKane is?

10         A.    I don't know.

11         Q.    A year?

12         A.    I don't know.

13         Q.    Five years?

14         A.    I don't know.

15         Q.    Ten years?

16               And how do you know who Mr. DuKane is?

17         A.    I know Mr. DuKane is the -- I don't know

18    what position he holds at nexTUNE.

19         Q.    Did you know Mr. DuKane before he held

20    his current position at nexTUNE?

21               MR. BADGLEY:  Could you read the

22    question back, please.

23               (Record read as follows:  "Did you know

24    Mr. DuKane before he held his current position at

25    nexTUNE?")

Page 49

1    Christopher Scott Harrison in Support of Motion to

2    Dismiss Pursuant to FRCP 12(b)(2).

3         Q.   And do you recall reviewing and signing

4    this document?

5         A.   Yes.

6         Q.   So you were employed with DMX from 2005

7    until 2012, approximately seven years.  Can you read

8    footnote one allowed, please?

9         A.   "While working for and at the direction

10   of a prior employer, I did visit my former

11   employer's Seattle office approximately once per

12   year, the last coming in August, 2011."

13        Q.   But you previously testified you only

14   have recollection of two visits to Seattle, correct?

15        A.   Uh-huh, correct.

16        Q.   Aside from the meeting with Mr. DuKane

17   in early September 2012, have you had any -- have

18   you ever had any other communications with

19   Mr. DuKane at any point in time for any reason?

20        A.   Yes.

21        Q.   Do you know when?

22        A.   I don't.

23        Q.   Do you know how many times?

24        A.   I don't.

25        Q.   And I assume you don't know what about?

Page 50

```
 1          A.   No.   Mr. DuKane was trying to get the

 2   new owners of DMX to do business with him and his

 3   music video service.

 4          Q.   And he had communications with you about

 5   that?

 6          A.   Yes.

 7          Q.   Do you recall what those conversations

 8   entailed?

 9          A.   I don't.

10          Q.   Aside from trying to get the new owners

11   of DMX trying to do business with Mr. DuKane's

12   entity, correct?

13          A.   Yes.

14          Q.   Okay.  Do you recall any other

15   communications you've had with him over the years?

16          A.   I don't.

17          Q.   Are you familiar with nexTUNE?

18          A.   Yes.

19          MR. BADGLEY:  I'm sorry, with -- oh,

20   with nexTUNE?

21          MR. DONOVAN:  Yeah.  Sorry.

22          Q.   (BY MR. DONOVAN)  Are you familiar with

23   nexTUNE's operations?  Let me go back.

24          Are you familiar with the kind of

25   business nexTUNE is?  Or are you familiar with
```

Page 51

1    nexTUNE's business?

2         A.   I understand that nexTUNE provides a

3    commercial music service.

4         Q.   Do you know whether it is more geared

5    towards the commercial aspect like Pandora, or the

6    individual and/or corporate aspect like Mood and

7    DMX?

8         A.   I don't.

9         Q.   Do you know where nexTUNE is located?

10        A.   I believe it's located in the state of

11   Washington.

12        Q.   Have you ever held yourself out to be a

13   representative of DMX in the state of Washington?

14        A.   I don't recall.

15        Q.   So would it surprise you that DMX holds

16   you out to be their secretary in their filings for

17   the state of Washington?

18        A.   Yes, it would surprise me.

19        Q.   Are you aware of the fact that DMX does

20   hold you up to be their secretary in the state of

21   Washington?

22        A.   I'm sorry, could you repeat the

23   question?

24             MR. DONOVAN:  Go ahead, repeat it.

25             (Record read as follows:  "Are you aware

Page 53

1    has trade secrets obviously, correct?

2         A.    While I was at DMX, yes, DMX had trade

3    secrets.

4         Q.    And would DMX be harmed if someone -- if

5    a competitor obtained those trade secrets?

6              MR. BADGLEY:  Well, Counsel, don't you

7    think that's a little beyond the scope of --

8              MR. DONOVAN:  No, I don't.

9              MR. BADGLEY:  -- of the deposition?

10             MR. DONOVAN:  No, I don't.

11             MR. BADGLEY:  You think that's

12   calculated to lead to the discovery of admissible

13   evidence?

14             MR. DONOVAN:  No, I think it's directly

15   related to jurisdiction.

16             MR. BADGLEY:  We'll go ahead and allow

17   it.

18             MR. DONOVAN:  Can you go ahead and

19   repeat the question.

20             (Record read as follows:  "And would DMX

21   be harmed if someone -- if a competitor obtained

22   those trade secrets?")

23             MR. BADGLEY:  Objection, calls for

24   speculation.  That's an open-ended hypothetical.

25             MR. DONOVAN:  You can answer it.

Page 54

1          MR. BADGLEY:  If you can answer it.

2          THE WITNESS:  No, I can't answer it.

3     Q.   (BY MR. DONOVAN)  Does Pandora have

4  trade secrets?

5     A.   I don't know.

6     Q.   Do you believe that Pandora would be

7  harmed if Pandora's competitors received those trade

8  secrets?

9          MR. BADGLEY:  Same objection,

10 speculation.

11         THE WITNESS:  I can't answer that

12 question.

13    Q.   (BY MR. DONOVAN)  And why can't you

14 answer that question?

15    A.   Because I don't have enough facts upon

16 which to make a conclusion.

17    Q.   And what facts would you need to know?

18    A.   A lot more.

19    Q.   Such as?

20    A.   I don't know.

21    Q.   And Pandora is headquartered here in the

22 San Francisco area, correct?

23    A.   It is.

24    Q.   And if a competitor did receive

25 Pandora's trade secrets, do you have any reason to

Page 55

1    believe that the harm that Pandora would suffer

2    would not take place here at its headquarters near

3    San Francisco?

4              MR. BADGLEY:  Objection, argumentative,

5    speculative, incomplete hypothetical, based on

6    assumptions of fact that are not in evidence.

7              MR. DONOVAN:  You can answer.

8              THE WITNESS:  No, I can't answer.

9         Q.   (BY MR. DONOVAN)  Why?

10        A.   Because you haven't given me enough

11   information to reach a conclusion.

12        Q.   If the trade secrets concerning

13   Pandora's operations and how it provided commercial

14   music services was provided to a direct competitor

15   of Pandora and used in a manner that was contrary to

16   Pandora's interest to obtain Pandora's customers,

17   and hurt Pandora's business, would the harm not be

18   suffered here by Pandora in San Francisco area?

19             MR. BADGLEY:  Objection, calls for a

20   legal conclusion, is argumentative, is hypothetical.

21   That's my objection.  You could answer it if you

22   can.

23             THE WITNESS:  I don't know.

24        Q.   (BY MR. DONOVAN)  Okay.  So you were

25   employed in Austin, Texas, or around Austin, Texas,

Page 56

1      since -- from 2001 until 2000, end of 2012, correct?

2              A.   Correct.

3              Q.   You've held many positions there, you've

4      had your own law firm there in Texas, correct?

5              A.   Correct.

6              Q.   Do you own property in Texas anymore?

7              A.   I do.

8                   MR. DONOVAN:  Going off the record.

9                   (Off the record.)

10             Q.   (BY MR. DONOVAN)  You don't own any

11     property in Washington?

12             A.   I don't.

13             Q.   You've never practiced law in

14     Washington?

15             A.   I have not.

16             Q.   Do you agree that nexTUNE would be

17     harmed if its trade secrets were provided to its

18     competitors?

19                  MR. BADGLEY:  Objection, calls for legal

20     conclusion.

21                  THE WITNESS:  No.

22             Q.   (BY MR. DONOVAN)  And what's your basis

23     for that?

24             A.   You haven't given me enough information

25     to agree with you.

Page 57

1          Q.   And what information would you need?

2          A.   It's your hypothetical.

3          Q.   And you answered it?

4          A.   Yes, I did.

5          Q.   And you said no.

6          A.   That's correct.

7          Q.   But you have no basis for that, correct?

8          A.   Yes, I do.  I told you what my basis

9     was.

10         Q.   You said your basis was that you had no

11    basis, correct?

12         A.   No, my basis was I had incomplete

13    information.

14         Q.   If the information that nexTUNE provided

15    to you and Mr. McKinney were provided to nexTUNE

16    competitors, wouldn't that harm nexTUNE's business?

17              MR. BADGLEY:  Objection, calls for a

18    legal conclusion, calls for speculation.

19              THE WITNESS:  I can't answer that.

20         Q.   (BY MR. DONOVAN)  Is it because you

21    don't know?

22         A.   Because your hypothetical doesn't

23    contain enough facts and information for me to make

24    a conclusion -- reach a conclusion, excuse me.

25         Q.   Will you admit that DMX and Mood Media

# EXHIBIT B

SEARCH

Contact Us | Connect:

# Corporations and Charities Division

| Corporations Home | Nonprofit Home | Charities Home | Awards | Public Notices | Contact Info |

## Corporation Detail

Neither the State of Washington nor any agency, officer, or employee of the State of Washington warrants the accuracy, reliability, or timeliness of any information in the Public Access System and shall not be liable for any losses caused by such reliance on the accuracy, reliability, or timeliness of such information. While every effort is made to ensure the accuracy of this information, portions may be incorrect or not current. Any person or entity who relies on information obtained from the System does so at his or her own risk.

All documents filed with the Corporations Division are considered public record.

### DMX, INC.

| | |
|---|---|
| UBI Number | 602507896 |
| Category | REG |
| Profit/Nonprofit | Profit |
| Active/Inactive | Active |
| State Of Incorporation | TX |
| WA Filing Date | 05/31/2005 |
| Expiration Date | 05/31/2013 |
| Inactive Date | |
| Duration | Perpetual |
| Registered Agent Information | |
| Agent Name | C T CORPORATION SYSTEM |
| Address | 505 UNION AVE SE STE 120 |
| City | OLYMPIA |
| State | WA |
| ZIP | 98501 |
| Special Address Information | |
| Address | |
| City | |
| State | |
| Zip | |

### Governing Persons

| Title | Name | Address |
|---|---|---|
| Director | LANTHIER , JAMES | 1703 WEST 5TH STREET SUITE 600 AUSTIN , TX 78703 |
| President,Chairman ,Director | CULLEN , JOHN | 1703 WEST 5TH STREET SUITE 600 AUSTIN , TX 78703 |

| Vice President | MICHALEC , SHERI | 1703 WEST 5TH STREET SUITE 600 AUSTIN , TX 78703 |
|---|---|---|
| Treasurer | SHIPMAN , KIMBERLY | 1703 WEST 5TH STREET SUITE 600 AUSTIN , TX 78703 |
| Director | GUJRAL , BEN | 1703 WEST 5TH STREET SUITE 600 AUSTIN , TX 78703 |
| Vice President | MCKINLEY , BRIAN | 1703 WEST 5TH STREET SUITE 600 AUSTIN , TX 78703 |
| Vice President,Secretary | MCCOOL , MELANIE | 1703 WEST 5TH STREET SUITE 600 AUSTIN , TX 78703 |
| Secretary | HARRISON , CHRISTOPHER | 1703 WEST 5TH STREET SUITE 600 AUSTIN , TX 78703 |
| Vice President | TAMEZ , DAVID | 1703 WEST 5TH STREET SUITE 600 AUSTIN , TX 78703 |

Purchase Documents for this Corporation »

« Return to Search List

---

Translate our site into:
Select Language
Powered by Google Translate
Phone Numbers | Privacy Policy | Accessibility | Mobile
Washington Secretary of State · Corporations Division
801 Capitol Way South
PO Box 40234, Olympia WA 98504-0234
(360) 725-0377

# EXHIBIT C



SEARCH

# Corporations and Charities Division

| Corporations Home | Nonprofit Home | Charities Home | Awards | Public Notices | Contact Info |
|---|---|---|---|---|---|

## Corporation Detail

Neither the State of Washington nor any agency, officer, or employee of the State of Washington warrants the accuracy, reliability, or timeliness of any information in the Public Access System and shall not be liable for any losses caused by such reliance on the accuracy, reliability, or timeliness of such information. While every effort is made to ensure the accuracy of this information, portions may be incorrect or not current. Any person or entity who relies on information obtained from the System does so at his or her own risk.

All documents filed with the Corporations Division are considered public record.

**CAPITOL RECORDS, LLC.**

| | |
|---|---|
| UBI Number | 409005591 |
| Category | LLC |
| Active/Inactive | Active |
| State Of Incorporation | DE |
| WA Filing Date | 04/03/1991 |
| Expiration Date | 04/30/2013 |
| Inactive Date | |
| Duration | Perpetual |
| Registered Agent Information | |
| Agent Name | C T CORPORATION SYSTEM |
| Address | 505 UNION AVE SE STE 120 |
| City | OLYMPIA |
| State | WA |
| ZIP | 98501 |
| Special Address Information | |
| Address | |
| City | |
| State | |
| Zip | |

### Governing Persons

| Title | Name | Address |
|---|---|---|
| Manager | FAXON, ROGER | 75 NINTH AVENUE NEW YORK, NY 10011 |
| Manager | CORBETT, LEO | 75 NINTH AVENUE NEW YORK, NY 10011 |

Purchase Documents for this Corporation »

« Return to Search List

# EXHIBIT D

Contact Us | Connect: 

SEARCH

# Corporations and Charities Division

| Corporations Home | Nonprofit Home | Charities Home | Awards | Public Notices | Contact Info |

## Corporation Detail

Neither the State of Washington nor any agency, officer, or employee of the State of Washington warrants the accuracy, reliability, or timeliness of any information in the Public Access System and shall not be liable for any losses caused by such reliance on the accuracy, reliability, or timeliness of such information. While every effort is made to ensure the accuracy of this information, portions may be incorrect or not current. Any person or entity who relies on information obtained from the System does so at his or her own risk.

All documents filed with the Corporations Division are considered public record.

### PANDORA MEDIA CALIFORNIA, LLC

| | |
|---|---|
| UBI Number | 603175995 |
| Category | LLC |
| Active/Inactive | Active |
| State Of Incorporation | CA |
| WA Filing Date | 01/26/2012 |
| Expiration Date | 01/31/2014 |
| Inactive Date | |
| Duration | Perpetual |
| Registered Agent Information | |
| Agent Name | C T CORPORATION SYSTEM |
| Address | 505 UNION AVE SE STE 120 |
| City | OLYMPIA |
| State | WA |
| ZIP | 98501 |
| Special Address Information | |
| Address | |
| City | |
| State | |
| Zip | |

### Governing Persons

| Title | Name | Address |
|---|---|---|
| Member | PANDORA MEDIA INC , | 2101 WEBSTER ST STE 1650 OAKLAND , CA 94612 |

Purchase Documents for this Corporation »

« Return to Search List

Contact Us | Comments                     SEARCH

# Corporations and Charities Division

| Corporations Home | Nonprofit Home | Charities Home | Awards | Public Notices | Contact Info |

## Corporation Detail

Neither the State of Washington nor any agency, officer, or employee of the State of Washington warrants the accuracy, reliability, or timeliness of any information in the Public Access System and shall not be liable for any losses caused by such reliance on the accuracy, reliability, or timeliness of such information. While every effort is made to ensure the accuracy of this information, portions may be incorrect or not current. Any person or entity who relies on information obtained from the System does so at his or her own risk.

All documents filed with the Corporations Division are considered public record.

### PANDORA MEDIA, INC.

| | |
|---|---|
| UBI Number | 603105817 |
| Category | REG |
| Profit/Nonprofit | Profit |
| Active/Inactive | Active |
| State Of Incorporation | DE |
| WA Filing Date | 06/13/2011 |
| Expiration Date | 06/30/2013 |
| Inactive Date | |
| Duration | Perpetual |
| Registered Agent Information | |
| Agent Name | C T CORPORATION SYSTEM |
| Address | 505 UNION AVE SE STE 120 |
| City | OLYMPIA |
| State | WA |
| ZIP | 98501 |
| Special Address Information | |
| Address | |
| City | |
| State | |
| Zip | |

### Governing Persons

| Title | Name | Address |
|---|---|---|
| President,Chairman ,Director | KENNEDY , JOSEPH | 2101 WEBSTER ST STE 1650 OAKLAND , CA 94612 |
| Vice President | CAKEBREAD , STEVEN | 2101 WEBSTER ST STE 1650 OAKLAND , CA 946123015 |

| Secretary | COSTIN , DELIDA | 2101 WEBSTER ST STE 1650<br>OAKLAND , CA 94612 |
| Treasurer | REGAN , TIMOTHY | 2101 WEBSTER ST STE 1650<br>OAKLAND , CA 946123015 |

Purchase Documents for this Corporation »

« Return to Search List

---

Phone Numbers | Privacy Policy | Accessibility | Mobile
Washington Secretary of State · Corporations Division
801 Capitol Way South
PO Box 40234, Olympia WA 98504-0234
(360) 725-0377

Translate our site into:
Select Language
Powered by Google Translate

# EXHIBIT E

## Jay Donovan

| | |
|---|---|
| **From:** | Michael DuKane <mdukane@nextune.net> |
| **Sent:** | Friday, March 08, 2013 9:21 PM |
| **To:** | Jay Donovan |
| **Subject:** | Fwd: DMX website |
| **Attachments:** | pastedGraphic.tiff |

This was a follow up email to Chris after a meeting between he and I in Austin.

Begin forwarded message:

**From:** Michael DuKane <mdukane@nextune.net>
**Date:** October 9, 2008 5:24:27 AM PDT
**To:** chris.harrison@dmx.com
**Cc:** ray basile <basile2@gmail.com>, brian.mckinley@dmx.com, alan.furst@dmx.com
**Subject:** DMX website

Chris:
It has been a while since we met in Austin. If you recall, we talked about putting up a consumer facing DMX brand onto the web. I'm not certain what you ended up doing, but I thought you might be interested in seeing the live version of what I presented to you last year. You can link into the site at http://www.nextune.com.

Ray Basile recently critiqued the site and was impressed and as you know he has pretty high standards when it comes to the creative side. You may find it equally impressive. Everything you see on our site was built  over a 90 day period for under $100,000.

I'm sure you'll agree that the opportunity for a web brand and artist promotion destination would greatly benefit DMX. I am still interested in offering our resources to build a compelling web image for DMX. If you have an interest in discussing this or are having challenges with your current resource to accomplish your goals please let me know. We're here to help.

Kind Regards,
Michael DuKane
Chief Executive/President



where people and music connect

8201 164th Avenue NE Suite 200
Redmond, WA 98052

www.nextune.com
Office: 425-869-9095
Cell: 206-719-1996
Fax: 425-861-7368

IMPORTANT/CONFIDENTIAL: This e-mail message (and any attachments accompanying it) may contain confidential information, including information protected by attorney-client privilege. The information is intended only for the use of the intended recipient(s). Delivery of this message to anyone other than the intended recipient(s) is not intended to waive any privilege or otherwise detract from the confidentiality of the message. If you are not the intended recipient, or if this message has been addressed to you in error, do not

1

read, disclose, reproduce, distribute, disseminate or otherwise use this transmission, rather, please promptly notify the sender by reply e-mail, and then destroy all copies of the message and its attachments, if any.